In re MOLTEN METAL TECHNOLOGY, INC., MMT of Tennessee, Inc., MMT Federal Holdings, Inc., M4 Environmental Management, Inc., M4 Environmental L.P., Debtors.

Stephen S. Gray, Chapter 11 Trustee, Plaintiff,

v.

Oppenheimer & Co., Inc., Defendant.

Bankruptcy Nos. 97–21385–CJK, 97–21386–CJK, 97–21387–CJK, 97–21388–CJK, 97–21389–CJK. Adversary No. 99–1646.

United States Bankruptcy Court, D. Massachusetts.

May 11, 2001.

174

Robert L. Hamer, Mirick O'Connell De-Mallie & Lougee, Worcester, MA, for Trustee.

Thomas E. Pitts, Jr., Sidney & Austin, New York City, for CIBC World Markets Corp., as successor to Oppenheimer & Co., Inc.

Stephen Gray, Boston, MA, Trustee.

### MEMORANDUM OF DECISION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

CAROL J. KENNER, Bankruptcy Judge.

By his complaint in this adversary proceeding, the Chapter 11 Trustee seeks to avoid and recover a prepetition transfer from the Debtor to the Defendant in the amount of $350,000.00. The Trustee maintains that the transfer was preferential and therefore is avoidable under 11 U.S.C.

§ 547. The Defendant, Oppenheimer & Co., Inc. ("Oppenheimer"),[1] denies several of the essential allegations under § 547(b) and interposes two affirmative defenses: contemporaneous exchange for new value, § 547(c)(1), and ordinary course of business, § 547(c)(2). The adversary proceeding is before the Court now on the parties' cross motions for summary judgment.

The following facts are uncontroverted and relevant to both motions. On June 4, 1997, the Debtor entered into an Engagement Agreement with two entities, Lazard Frères and Company LLC and Oppenheimer & Co., Inc., under which the Debtor retained Lazard and Oppenheimer to act as financial advisers to the Debtor for a period of six months in connection with a public or private financing or joint venture. The Agreement contained the following provisions for payment of Lazard and Oppenheimer:

2. In consideration for our services, you [the Debtor] agree to pay us the following:

(a) A financial advisory fee of $200,000, 50% ($100,000) of which is payable upon the signing of this letter and the remaining 50% ($100,000) of which is payable on July 30, 1997. Such advisory fee will be credited against the payment of any fees pursuant to Sections 2(b) and 2(c) hereof and will be split equally between Lazard and Oppenheimer.

(b) In the event that the Transaction involves a private placement of common stock, other equity or equity-linked securities of the [Debtor], an additional fee payable upon closing of

1. The complaint names Oppenheimer & Co., Inc. as defendant but was answered by CIBC World Markets Corp. as successor to Oppenheimer. For purposes of this memorandum, the court will refer to the defendant as Oppenheimer, as it was known at all times relevant to this proceeding.

4% of such total proceeds raised in the private placement.

The Debtor paid the initial $100,000 installment (in equal parts to Lazard and Oppenheimer) upon entering into the Agreement but did not pay the second $100,000 installment when due. The Engagement resulted in a private sale of $20 million of preferred stock in the Debtor to third-party investors ("the investors"), which sale closed on September 8, 1997. The next day, Lazard issued an invoice to the Debtor for the remaining amounts due to Lazard and Oppenheimer under the Engagement Agreement, totaling $700,000. This amount included the second $100,000 installment, then still outstanding, and the balance of the 4% of total proceeds from the sale. On September 10, 1997, the Debtor issued a check for $350,000 to Oppenheimer, representing Oppenheimer's share of the balance due under the Agreement. Oppenheimer received the check sometime between September 10 and September 22, 1997.

On the basis of an SEC report that the Debtor subsequently filed for the quarter ending September 30, 1997, certain of the investors alleged that an event had occurred that gave rise under their stock purchase agreement to a right to immediate return of all the funds invested. (The Trustee has not identified the alleged "redemption event.") Accordingly, they have made demand on the Debtor, and asserted claims in this case, for return of all the funds invested. The Trustee has not yet determined the extent or validity of these claims. On December 3, 1997, the Debtor filed its petition under Chapter 11 of the Bankruptcy Code.

## STANDARDS AND BURDENS OF PROOF ON SUMMARY JUDGMENT

A party is entitled to summary judgment only upon a showing that there is no genuine issue of material fact and that, on the uncontroverted facts, the movant is entitled to judgment as a matter of law. F.R.Civ.P. 56(c). Where the burden of proof at trial would fall on the party seeking summary judgment, that party must support its motion with evidence—in the form of affidavits, admissions, depositions, answers to interrogatories, and the like—as to each essential element of cause of action. The evidence must be such as would permit the movant at trial to withstand a motion for directed verdict under F.R.Civ.P. 50(a). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the motion is properly supported, the burden shifts to the adverse party to submit evidence demonstrating the existence of a genuine issue as to at least one material fact. If the adverse party does not so respond, "summary judgment, if appropriate, shall be entered against the adverse party." F.R.Civ.P. 56(e); *Jaroma v. Massey,* 873 F.2d 17, 20 (1st Cir.1989).

Where the moving party would not bear the burden of proof at trial, the movant's initial burden is to demonstrate or point out a lack of evidence to support at least one essential element of the opposing party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the opposing party to adduce such evidence on each of the disputed elements as at trial would be sufficient to withstand a motion for directed verdict. *Anderson v. Liberty Lobby, Inc., supra.* Summary judgment will enter for the movant if the party bearing the burden of proof fails to establish the existence of an element essential to its case. *Celotex Corp. v. Catrett,* 477 U.S. at 322–323, 106 S.Ct. 2548; *In re Varrasso,* 37 F.3d 760, 763 n. 1 (1st Cir.1994).

The Trustee bears the burden of proof as to the avoidability of the transfer under

547(b), and Oppenheimer bears the burden as to its affirmative defenses. 11 U.S.C. § 547(g).

## OPPENHEIMER'S MOTION FOR SUMMARY JUDGMENT

 Oppenheimer seeks summary judgment on the strength of its affirmative defenses, as to which it bears the burden of proof. The first is the contemporaneous exchange for new value defense, under which a transfer is not avoidable under § 547

> to the extent that such transfer was—
>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>> (B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1). This defense requires proof of three elements: (1) that the creditor (or someone on the creditor's behalf) advanced a certain amount of new value to the debtor in exchange for the payment (the defense is available only to the extent of the value advanced); (2) that the transfer was "substantially contemporaneous" with the tender of new value to the debtor; and (3) that the debtor and creditor specifically intended for the transfer to constitute an exchange for the new value.

### 1. Value

As proof that it advanced new value to the Debtor in the amount of the disputed transfer, $350,000, Oppenheimer relies on the fact that it performed the services that, under the Engagement Agreement, gave rise to the obligation to pay: it performed the services for which it was engaged and produced buyers who in fact invested $20 million in the Debtor. But Oppenheimer also appears to contend that the value it produced included the $20 million that the investors paid for their preferred stock. The Trustee, on the other hand, contends that the value tendered by Oppenheimer consisted only of its services, and that these were of no value because, after accounting for the investors' subsequent claims for redemption, the investment facilitated by Oppenheimer resulted in no net increase in value to the Debtor.

 The Court agrees with both parties that the "value" advanced by Oppenheimer included Oppenheimer's services and success in procuring investors for the Debtor, and that, absent any set off for the redemption claims, the services should be valued at the contract rate: $100,000 for the services, payable regardless of success, and $300,000 for success, payable only if and when the financing closed. The Court rules that Oppenheimer should not have further credit for the $20 million of equity investment that it helped the Debtor procure; the $20 million was not contributed by or on behalf of Oppenheimer.

 The Court rejects the Trustee's argument that the value or Oppenheimer's services should be reduced on account of the investors' demands for redemption of their investments. Standing alone, these claims are not enough to warrant a reduction in the value attributable to Oppenheimer's services. The Trustee has submitted no evidence (nor even alleged) that these claims reflect a defect in Oppenheimer's efforts, or that the Debtor was contractually entitled to damages or an offset against Oppenheimer on account of the redemption claims. Moreover, even if the redemption claims could, as a matter of law, warrant a reduction in the value of Oppenheimer's services, they could do so only if they were valid, but the Trustee has neither submitted evidence to that effect nor even stated a position on the issue.

For these reasons, the Trustee has not sustained his burden of showing that there exists a genuine issue of material fact for trial as to this offset. The Court concludes that Oppenheimer is entitled to a determination, as a matter of law, that it gave total value of $350,000.

### 2. *Contemporaneous Exchange*

■ Oppenheimer must also establish that the transfer at issue was substantially contemporaneous with the tender of new value to the debtor. Oppenheimer contends that this transfer, which mas made by a check issued on September 10 and received between then and September 22, 1997, was substantially contemporaneous with the closing on September 8, 1997, the date on which Oppenheimer's efforts finally bore fruit for the debtor. The Trustee makes no issue over the delay between September 8 and Oppenheimer's actual receipt of the check and does not deny that payment was substantially contemporaneous with the closing. Rather, the Trustee argues that payment was not substantially contemporaneous with Oppenheimer's delivery of value. Oppenheimer gave value to the Debtor, not upon the final delivery of a paying investor on September 8, but throughout the period during which Oppenheimer expended effort on the Debtor's behalf. This position, argues the Trustee, is consistent with the Engagement Agreement, which characterizes the payment not as a commission but as "consideration for our services," and with the definition of claim in § 101(5) of the Bankruptcy Code, under which a claim is deemed to exist even when it remains contingent. Also, the Trustee argues that, even if some of

the value is deemed to lie in the final success on September 8, only $300,000 of the value can properly be ascribed to that success because, under the Licensing Agreement, $50,000 of the $350,000 payment was required to be paid regardless of success.

The Court finds that there are no genuine issues of material fact as to when Oppenheimer delivered value, and that, as a matter of law, $300,000 of its value should be deemed to have been adduced at the closing. I base this ruling on the Engagement Agreement itself. It is true, as the Trustee points out, that the Agreement does not characterize this final payment as a commission, and that it does expressly characterize all required payments as consideration for Oppenheimer's services. But service and success are not mutually exclusive: success in this context is the service of producing entities who actually do invest in the Debtor. In view of the structure of the agreement, this must be what the Debtor and Oppenheimer intended. Under the Agreement, the amount of the final payment is a function of the amount of the investment obtained; the payment itself is entirely contingent on success in obtaining investment; and the payment becomes due only upon the closing of the stock sale. Therefore, by design and function, the final payment is a payment for success.[2] By the same reasoning, payments that were not contingent on success are, by design and function, properly ascribed to Oppenheimer's efforts, not to its success; the Debtor was obligated to pay for these efforts regardless of whether they proved successful. I conclude that

---

**2.** The Trustee's reliance on the definition of claim is misplaced. The definition of claim is relevant to the issue of when a debt is deemed to have arisen, 11 U.S.C. § 101(12) ("debt" means liability on a claim), but not to when value should be deemed to have been con-

veyed. "New value" is separately defined, in relevant part, as "money or money's worth in ... services," and is not synonymous with debt or claim. 11 U.S.C. § 547(a)(2) (defining "new value" for purposes of § 547).

Oppenheimer has established that it conveyed value in the amount of $300,000 to the Debtor on the date of the closing, and that this conveyance was substantially contemporaneous with the challenged payment. As to the remaining $50,000 of value, however, the evidence does not establish that conveyance was substantially contemporaneous with payment.

### 3. *Specific Intent*

Oppenheimer must also establish that the challenged payment was *intended* by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor. 11 U.S.C. § 547(c)(1)(A). With respect to the $50,000 paid at the closing for the installment that was due on July 30, 1997, the evidence does not permit such a finding. As to the remainder, however, the only evidence of record is the Engagement Agreement itself and certain deposition testimony of Jonathan O'Herron, the managing partner at Lazard who negotiated the Engagement Agreement with the Debtor. As I explained above, the Agreement permits no conclusion other than that the parties intended for the final payment to be compensation for success. O'Herron likewise characterizes the contingent portion of the fee as a "success fee," payable for success. (O'Herron Deposition of January 10, 2001, pp. 30 and 33–34.) There is no evidence to the contrary; and, though generally reluctant to dispose of intent issues by motion for summary judgment, the Court concludes that a reasonable finder of fact could not but find, on the evidence adduced in conjunction with this motion, that the parties intended a contemporaneous exchange. Accordingly, as to $300,000 of the $350,000 at issue, there is no genuine issue of material fact, and Oppenheimer is entitled to judgment as a matter of law.

### 4. *Ordinary Course of Business*

■ Oppenheimer also seeks summary judgment on the basis of the ordinary course of business defense, 11 U.S.C. § 547(c)(2). The Court will deny Oppenheimer's motion for summary judgment with respect to this defense. As to the $50,000 that is not protected by the contemporaneous exchange for new value defense, it is undisputed that the payment was made some forty to fifty days after it was due; therefore, it was not paid in the ordinary course of business between the parties, as defined by their Engagement Agreement and, by the evidence before me, would appear *not* to qualify for this defense. As to the other $300,000, the Court has already ruled that Oppenheimer is entitled to summary judgment on separate grounds, so the Court need not and will not address this defense in the context of this motion.

### TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

The Trustee has filed a cross motion for summary judgment, and Oppenheimer opposes the cross motion. Though both parties argued this motion as if it concerned the entire $350,000 payment, the amount remaining in controversy is only $50,000.00, consisting of the portion of the payment that was overdue and not contingent on success. Therefore, I will address this motion only insofar as it concerns that $50,000.00.

The Trustee contends that the payment satisfies the requirements of his case in chief under § 547(b) and that it does not qualify for either of the affirmative defenses that Oppenheimer has invoked. Although Oppenheimer's answer puts the Trustee to his proof as to most of the operative allegations of the Trustee's case

under § 547(b), Oppenheimer opposes the motion for summary judgment primarily on the strength of its affirmative defenses and, except on the requirement of an antecedent debt, § 547(b)(2), offers no defense as to the elements of § 547(b).

### a. *Elements of § 547(b)*

The Trustee must establish that there is no genuine issue of material facts as to the each element of his case in chief under § 547(b), of which there are six: that

1. the debtor made a transfer of an interest of the debtor in property,

2. on or within 90 days before the date of the filing of the petition

3. and while the debtor was insolvent,

4. to or for the benefit of a creditor and

5. for or on account of an antecedent debt owed by the debtor before such transfer was made,

6. which transfer enables the creditor to receive more than the creditor would receive if—

(A) the case were a case under chapter 7 of the Bankruptcy Code,

(B) the transfer had not been made, and

(C) such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

11 U.S.C. § 547(b). Oppenheimer admitted the first in its Answer: the Debtor made a transfer of $350,000 of its funds to Oppenheimer. The evidence is uncontroverted as to the second: the transfer was made between September 10 and September 22, 1997, on a date within 90 days before December 2, 1997, the date of the filing of the petition. The third is established by virtue of the statutory presumption of insolvency during the 90 days immediately preceding the bankruptcy filing,

11 U.S.C. § 547(f) ("For the purposes of this section, the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."), and the lack of evidence to rebut the presumption. Oppenheimer's Answer admits the fourth element: that Oppenheimer was a creditor of the Debtor at the time the payment was made.

■ The parties disagree as to whether the fifth element is satisfied, but their disagreement is one of law; the underlying facts are not controverted. The fifth requirement is that the transfer must have been made "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C. § 547(b)(2). Oppenheimer states that the $350,000 payment was not owing until the stock sale actually closed, and, since payment was substantially contemporaneous with the stock sale, the debt was not owed before the transfer. As to the $50,000 that remains in issue, the Trustee responds that, under the Engagement Agreement, payment was unconditional and due on July 30, 1997, not at the time of the September 8 closing. Oppenheimer offers no response to this argument. The Court agrees with the Trustee: under the Engagement Agreement, the $50,000 remaining at issue was owed no later than July 30, 1997. Accordingly, the September payment on that obligation was "for . . . an antecedent debt owed by the debtor before such transfer was made," as required by § 547(b)(2).

The final requirement of the Trustee's case under § 547(b) is that of preferential effect: that the transfer resulted in the creditor's receipt of more than the creditor would have received in a hypothetical distribution under chapter 7 had the transfer not been made. 11 U.S.C. § 547(b)(5). Oppenheimer neither concedes nor con-

tests this element. By the affidavit of his accountant, the Trustee has introduced evidence that the Debtor was insolvent by $55,000,000 on the date of the bankruptcy filing; it follows from this fact that unsecured creditors would have received distributions of less than 100% in a case commenced on the same date under Chapter 7. Oppenheimer has submitted no evidence to controvert the Trustee's proof nor to suggest that its claim would have been anything other than a nonpriority, unsecured claim. Therefore, there is no genuine issue of material fact as to this element. As to the remaining $50,000 in issue, the Trustee has established this and all the elements of his case in chief under § 547(b) as a matter of law.

### b. *Affirmative Defenses*

Oppenheimer argues that the Trustee is not entitled to summary judgment because of its affirmative defenses: the contemporaneous exchange for new value defense, § 547(c)(1), and the ordinary course of business defense, § 547(c)(2). Oppenheimer bears the burden of proof as to these and therefore, to prevail on this motion, must adduce such evidence, with respect to each element of at least one of its defenses, as would permit Oppenheimer to survive a motion for directed verdict as to the defense. The Court concludes that Oppenheimer has not carried that burden as to either defense.

With respect to the contemporaneous exchange for new value defense, Oppenheimer must prove both that the transfer was contemporaneous with Oppenheimer's delivery of the value for which it was exchanged, and that the parties intended for the transfer to be a contemporaneous exchange for new value. But the Engagement Agreement makes clear that Oppenheimer and the Debtor understood that this $50,000 was not payment for success;

rather it was payment for Oppenheimer's service, regardless of its success, indeed for undertaking an open-ended effort without certainty of success. By the terms of the Agreement, this payment was due on July 30, 1997. By the parties' understanding and intent, the payment of this $50,000 was not contemporaneous payment for new value but simply late payment for value that had already been rendered, over the duration of the contract. There being no evidence to the contrary, I conclude that Oppenheimer has failed to establish a genuine issue of material fact as to the contemporaneousness of the exchange and as to intent to effect a contemporaneous exchange. On the basis of both issues, the Trustee is entitled, as a matter of law, to a determination that the contemporaneous exchange for new value defense is unavailable as to the $50,000 remaining in issue.

With respect to the "ordinary course of business defense," § 547(c)(2), Oppenheimer must establish (among other things) that the transfer was made "in the ordinary course of business or financial affairs of the debtor and the transferee." 11 U.S.C. § 547(c)(2)(B). In this instance, the Engagement Agreement expressly required payment of the $50,000 at issue on July 30, 1997. The payment was made between September 10 and 22, 1997, forty to fifty-two days after it was due. Payment significantly after the date required in the agreement between the parties does not necessarily preclude a payment from satisfying § 547(c)(2)(B), but it is preclusive in the absence of evidence indicating that late payment had become ordinary in the course of dealing between debtor and transferee.

Oppenheimer's evidence as to this course of dealing is set forth in the affidavits of Benjamin Downs, the Debtor's chief financial officer and treasurer from 1990 to 1997, and the affidavit of Jonathan O'Her-

ron, the limited managing director at Lazard Frères & Co. LLC who negotiated the Engagement Agreement with the Debtor, and in separate deposition testimony of O'Herron. Downs identifies four stock offerings for which the Debtor employed Oppenheimer, but his affidavit does not set forth the payment terms of these engagements. Therefore, although Downs states that, in each instance, Oppenheimer's fee was paid within several days of the closing, the evidence does not permit the Court to determine that any such payments were late, and that late payments had, by the time of the transaction at issue, become ordinary between the parties.

O'Herron states that "Lazard understood from Molten [the Debtor] that, in accordance with the engagement agreement, Molten would pay the bulk of this fee [the fee due Oppenheimer and Lazard under the Engagement Agreement] upon closing of the offering." O'Herron does not explain what he means by "the bulk of the fee."In view of the phrase "in accordance with the engagement agreement," the "bulk" to which O'Herron referred was probably the portion of the fee that, under the agreement, was contingent and payable upon the closing, not the portions that under the agreement were due earlier. No reasonable finder of fact could construe this testimony as proof by a preponderance of the evidence that the Debtor and Lazard and Oppenheimer understood that the portion of the fee that was due on July 30, 1997, would be paid only upon closing. At the time the agreement was negotiated, all parties understood that, although the $50,000 at issue was noncontingent, the

closing was contingent on success and might never occur. It defies logic to conclude that the parties contemplated that a noncontingent payment would be paid only upon the occurrence of an event that might not occur. Oppenheimer has adduced no other evidence as to the course of dealing between the parties. On this record, no reasonable finder of fact could find that the Oppenheimer had sustained its burden of proof as to § 547(c)(2)(B).

Therefore, I conclude that there is no genuine issue of material fact under 547(c)(2)(B), and that the Trustee's motion for summary judgment must be allowed as to this defense.[3] Having concluded that the Trustee is entitled to summary judgment as to its case in chief and that Oppenheimer has failed to demonstrate the existence of a genuine issue of material facts as to either of its affirmative defenses, the Court concludes that the Trustee is entitled to judgment as a matter of law as to the remaining $50,000 at issue.

### ORDER

For the reasons set forth above, the Motion of CIBC World Markets Corp., as successor in interest to Oppenheimer & Co., Inc., for Summary Judgment is allowed with respect to $300,000 of the payment at issue and denied as to the remaining $50,000; and the Plaintiff's Motion for Summary Judgment is allowed only with respect the remaining $50,000. The issues having been fully disposed of by these motions, a separate judgment will enter in accordance with these rulings.

---

**3.** Oppenheimer's evidence also fails to establish the existence of a genuine issue of material fact as to the requirement in § 547(c)(2)(C) of payment "according to ordinary business terms," again because the evidence does not address industry practice with respect to the

timeliness in paying noncontingent fees. However, because this defense already fails on under part (B) of this defense, the Court need not address the evidentiary shortcomings under part (C).

182

## JUDGMENT

For the reasons set forth in the separate memorandum of decision issued today on the parties' cross motions for summary judgment,

The Court hereby ORDERS and ADJUDGES that the Plaintiff, Stephen S. Gray, as he is Chapter 11 Trustee in the case of Debtor Molten Metal Technology, Inc., recover of the Defendant, Oppenheimer & Co., Inc., or its successor, CIBC World Markets Corp., the sum of $50,000.00, plus interest thereon at the rate of 3.9% per annum from December 2, 1999, the date on which this adversary proceeding was commenced,[1] and that, as to the remainder of the amount sought in the complaint, the complaint is dismissed on its merits.

---

1. The applicable interest rate is the rate prescribed in 28 U.S.C. § 1961(a). With respect to a preference recovery under 11 U.S.C. § 547(b), interest accrues from the date of demand, but if no demand was made then from the date on which the adversary proceeding was commenced. *Gray v. Travelers Ins. Co. (In re Neponset River Paper Co.)*, 219 B.R. 918 (Bankr.D.Mass.1998), *aff'd* 231 B.R. 829 (1st Cir. BAP 1999).