In re Lonnie Ray BAGWELL, dba P & L Distributors Shake & Cedar Products; L.B. Shake Co.; Little L.B. Mill and Phyllis Lorene Bagwell, Debtors.

Paul LANSDOWNE, Trustee, Plaintiff,

v.

HARBOR SECURITY BANK, Defendant.

Bankruptcy No. 680–06277.
Adv. No. 680–6302.

United States Bankruptcy Court,
D. Oregon.

March 30, 1983.

James Caher, Eugene, Or., for plaintiff.

Gavin Armstrong, Eugene, Or., for defendant.

## MEMORANDUM OPINION

C.E. LUCKEY, Bankruptcy Judge.

Plaintiff-trustee seeks to recover payments made by the debtor to Harbor Security Bank (Bank) totalling $71,153.08 as voidable preferences under 11 U.S.C. Section 547. Each party has moved for summary judgment representing that there is no issue as to any material fact.

The record reveals the following facts: The debtor purchased wood shakes from Winslow Shake Company (Winslow). Winslow and the Bank had a financing arrangement whereby Winslow assigned its accounts to the Bank for collateral security. The procedure followed with regard to the accounts here in question was set forth in the affidavit of Richard A. Olin, president of the Bank. Winslow prepared individual invoices for each order on the same day the goods covered by the invoice were shipped to the debtor. At the same time, Winslow assigned the specific account receivable represented by an invoice by executing a security agreement in favor of the Bank identifying the specific account receivable by date, invoice number, debtor's name and dollar amount. The Bank advanced Winslow 80% of the invoice amount for which Winslow executed a promissory note to Bank, due in 30 days. At the same time the Bank advanced money to Winslow, the Bank notified the debtor to make payment to the Bank by letter and a copy of the invoice with a stamped notation that the account had been assigned to the Bank. On receipt of payment by the debtor, the Bank would apply the payment toward the debt of Winslow as evidenced by the corresponding promissory note and to the general credit line of Winslow.

This arrangement and relationship between Winslow, the debtor and the Bank existed since 1975 with numerous such transactions in 1978 and 1979 all of which were satisfactorily completed except as discussed below. The debtors filed their voluntary Chapter 7 petition on April 1, 1980. The following chart summarizes the transactions involving payments which the trustee seeks to recover:

| Invoices | Date Goods Purchased | Purchase Price | Date Check Given | Actual Payment Date | Amount of Payment | Days Before Check | Days Before Actual Payment |
|---|---|---|---|---|---|---|---|
| 1991 | 11/21/79 | $6,141.28 | | | | 19 | 54 |
| 1992 | 11/21/79 | $9,690.24 | | | | 19 | 54 |
| 1993 | 11/21/79 | $5,480.16 | 12/10/79 | 1/14/80 | $26,685.68 | 19 | 54 |

| Invoices | Date Goods Purchased | Purchase Price | Date Check Given | Actual Payment Date | Amount of Payment | Days Before Check | Days Before Actual Payment |
|---|---|---|---|---|---|---|---|
| 1994 | 11/28/79 | $1,000.00 | | | | 12 | 47 |
| 1995 | 11/30/79 | $4,364.00 | | | | 10 | 45 |
| 1996 | 12/03/79 | $8,149.68 | 1/09/80 | | $ 8,149.68 | 37 | 37 |
| 1997 | 12/05/79 | $7,820.40 | 1/09/80 | 1/25/80 | $ 7,820.40 | 35 | 51 |
| 1998 | 12/05/79 | $2,943.20 | 1/18/80 | | $ 8,705.12 | 42 | 42 |
| 1999 | 12/07/79 | $5,761.92 | | | | 44 | 44 |
| 2900 | 12/17/79 | $7.295.90 | 1/9/80 | | $11,717.66 | 23 | 23 |
| 2901 | 12/18/79 | $4,421.76 | | | | 22 | 22 |
| 2902 | 12/20/79 | $4,371.50 | 2/04/80 | | $ 4,371.50 | 46 | 46 |
| 2909 | 1/14/80 | $3,703.04 | 2/12/80 | 2/26/80 | $ 3,703.04 | 29 | 29 |

Further, the following transactions involve invoices for goods which were shipped to the debtor for which payment was never made:

| Invoice No. | Date | Amount |
|---|---|---|
| 2914 | 2/08/80 | $ 7,615.44 |
| 2856 | 2/25/80 | 7,573.44 |
| 2910 | 1/17/80 | 5,429.82 |
| 2912 | 1/25/80 | 7,738.08 |
| 2915 | 3/16/80 | 7,615.44 |
| 2916 | 2/28/80 | 7,563.36 |
| 2913 | 1/31/80 | 7,615.44 |
| | | $51,151.02 TOTAL |

The Bank contends that the payments received on Invoices Nos. 1995, 2909, 2901, 2900, 1996, 1998 and 1999 totalling $36,-633.50 are not voidable by the trustee on the basis of 11 U.S.C. Section 547(c)(2) because payment was made within 45 days after the invoices dates. The Bank further contends that the goods shipped to the debtor represented by Invoices Nos. 2914, 2856, 2910, 2912, 2915, 2916 and 2913 totalling an undisputed value of $51,151.02, constitute "new value" as defined in Section 547(a)(2) of the Code and more than offset the aggregate amount of the challenged invoices paid more than 45 days after their dates under 11 U.S.C. Section 547(c)(4).

The trustee contends that the assignments of the accounts to the Bank by Winslow created a "creditor-debtor" relationship between the Bank and the debtors for purposes of Section 547(b)(1) of the Code as defined by Section 101(9) of the Code; that the payments the trustee seeks to recover were to or for the benefit of the Bank as an unsecured creditor of the debtors which received payments on antecedent debts during the 90 days preceding the debtors' bankruptcy. The trustee further contends that the debts were incurred by the debtors through the purchase of shakes and thus not incurred in the ordinary course of business of the Bank as required by Section 547(c)(2) of the Code. Also, the Bank, as the creditor receiving the alleged preferential payments, never supplied any new value to or for the benefit of the debtor to enable it to come within the exception of Section 547(c)(4) of the Code.

The crux of the dispute before the Court is the characterization of the relationship between the Bank and the debtors. The issue is whether the Bank, as assignee, owned the accounts and received payments for its own benefit, or whether Winslow was the creditor of the debtor and the Bank received payments for Winslow's benefit, as the accounts comprised collateral security for the Bank's loans to Winslow.

The document creating the assignment from Winslow to the Bank is titled "Security Agreement-Specific Accounts Receivable" and provides in pertinent part:

"For valuable consideration, Debtor assigns to Secured Party as security for all liabilities and indebtedness, now or hereafter arising, of Debtor to Secured Party, the account or accounts listed above, and all proceeds or sums due or to become due thereunder (hereinafter called "collateral"). Debtor warrants and covenants: (a) That the amounts listed are justly

owing from the account debtor listed; (b) That there are no offsets or counterclaims or defenses to said accounts which can be asserted against the Secured Party or against Debtor; (c) That Debtor has marketable title to every account so scheduled and that none of them is subject to any other security agreement. When more than one person is the Debtor they shall be jointly and severally liable. DEBTOR HEREBY REPRESENTS, COVENANTS AND AGREES WITH SECURED PARTY AS FOLLOWS:

### 1. Performance

Debtor agrees to perform promptly all its obligations, including the performance of any sales warranties, arising from the transaction which created any assigned account.

### 2. Taxes

Debtor will pay before delinquency any tax or other governmental charge which is or can become through assessment or distraint or otherwise a lien, claim or encumbrance on the collateral and will pay any tax which may be levied on any obligation secured hereby.

### 3. Notices to Account Debtors

Secured Party is authorized to notify the account debtors and to effect direct collection of the accounts. At the request of Secured Party, Debtor agrees to enter into appropriate notices to the account debtors.

### 5. Collections

(a) Debtor will not sell, assign or collect any part of the collateral or the interest of Debtor therein save as provided in this agreement or on prior written consent of the Secured Party.

(b) Until contrary notice is given by Secured Party, the Debtor is authorized to enforce and collect the accounts secured hereby, at Debtor's expense, and as shall be commercially reasonable, to accept the return of goods and to reclaim, withhold or repossess goods as an unpaid seller, and Secured Party shall have a security interest therein. In collecting, holding or remitting the proceeds of such collections, the Debtor shall have no right to utilize the collections, returns, redemptions or repossessions in any way other than pursuant to the terms and conditions of this Security Agreement.

(c) Upon notification by the Secured Party to the Debtor to cease collecting on accounts hereby assigned, Secured Party may proceed to collect said accounts in a commercially reasonable manner and may deduct from the proceeds its reasonable expenses of collection, Secured Party is authorized to receive in full satisfaction of account debtor's obligation a sum less than the face amount thereof.

(d) Any payment made by Debtor or any sum received by the Secured Party through the realization and collection of of (sic.) the accounts may be applied as Secured Party shall elect to any obligation secured by this Security Agreement, whether matured or not matured.

(e) Debtor will hold Secured Party harmless from all claims for loss or damage caused by any failure to collect any amount or by any act or omission on the part of the Secured Party, its officers, agents and employees, except willful misconduct.

### 10. Remedies

In the event of a default hereunder, Secured Party shall have all remedies provided by law and, without limiting the generality of the foregoing, shall be entitled as follows:

(a) To make notification as provided by this Agreement and pursue collection or, at Secured Party's option, to sell all or part of said accounts and make application of all proceeds or sums due on said accounts as provided for in this agreement.

(b) Debtor agrees to pay, if this Security Agreement or any obligation secured by it is referred to an attorney for collection or realization, a reasonable

attorney's fee (including those incurred in either a trial court or appellate court or without suit), expenses of title search, all court costs and all other legal expenses, and sums so obligated are secured hereby.

(c) Debtor agrees that a period of five (5) days from the time the notice is sent shall be a reasonable period of notification of a sale or other disposition of collateral by or for Secured Party. Any notice or other communication from the Secured Party to the Debtor under or pursuant to this agreement or required by any statute shall be addressed to the mailing address of Debtor as herein stated.

(d) Debtor agrees to pay any deficiency remaining after collection of or realization by the Secured Party on the accounts secured by this agreement."

The terms of the assignment are definite and detailed. They reflect, not a purchase of the accounts, but an assignment for collateral security and provision for collection. The stamp on the invoice sent to the debtor does not control the terms of the assignment but merely notifies the debtor that the account has been assigned. Section 80.-010 of the Oregon Revised Statutes provides:

"80.010 Assignment of chose in action; payment by debtor without notice. Any bona fide assignment of a chose in action by way of sale or pledge made in writing for a good, valuable and adequate consideration is deemed completed at the time the writing is executed by the assignor and takes effect at the time of execution according to the terms of the writing without the giving of notice to the debtor therein mentioned unless such notice is required by statute; but if notice is not given to a debtor, and such debtor, without knowledge of the assignment pays or discharges in whole or in part his obligation to the assignor or to any subsequent assignee of the chose in action who has given notice, such payment constitutes a discharge of the debtor to the extent thereof without prejudice to any right or remedy between the several assignees."

The Bank, as secured creditor of Winslow, has the rights granted to it in the security instrument with regard to the accounts.

■ The Bank is liable to the trustee to the extent that it retained preferences voidable as to Winslow. However, since the true creditor-debtor relationship, for purposes of Section 547 of the Code, existed between Winslow and the debtors, the exceptions of Section 547(c)(2) and (4) are applicable to this case.

The thrust of the plaintiff's argument is based upon a strained and legalistic construction of language of the Bankruptcy Code in application of the words "creditor" and "transferee", and what is in "the ordinary course of business". As plaintiff notes in his memorandum, an assignee stands in the shoes of his assignor, citing authority for the proposition.

There is no legislative history according any reason to interpret the word "transferee" so as to restrict its meaning to limit the word "transferee" to overcome the general proposition of law that an assignee-transferee stands in the shoes of the assignor as to benefits and burdens.

■ The "ordinary course of business" exclusion, which excludes from avoidable preferential transfers those made within the 45 day period, seems sufficiently broad to enable an assignee in a usual commercial transaction of bank financing based upon assigned invoices of shipment to treat the transfers as within terms of the exclusion. The concept of the Bankruptcy Code was to bring the Code more into harmony with the Uniform Commercial Code. See H.R.Rep. No. 595, 95th Cong. 1st Sess. 179 and 372 ff. (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

At page 373 of the House Report, U.S. Code Cong. & Admin.News 1978, p. 6329, it is noted that:

"The purpose of this exception is to leave undisturbed normal financial relations, because it does not detract from the gen-

eral policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."

■ 11 U.S.C. Section 550 protects the trustee from attempts by assignments to shield recovery from recipients of preferential transfers by initial transferees, and allows recovery from them. The section separates the concepts of avoidable transfers and recoverability from the transferees. In the present case, the Bank was the initial transferee, receiving payment for itself and Winslow, the entity for whose benefit it also was received, and in whose shoes as assignee it stood.

■ The Bankruptcy Court is a court of equity, and to so interpret the language of the Code as to deprive the assignee-bank of defenses of its assignor would work an inequitable result. See *In re Church Buildings and Interiors, Inc.*, 14 B.R. 128 (Bkrtcy. W.D.Okl., 1981).

■ Consequently, based on the record before the Court, the payments the trustee seeks to recover from the Bank are not avoidable as preferences pursuant to 11 U.S.C. Section 547(c) because payments made on Invoices Nos. 1995, 1996, 1998, 1999, 2900, 2901 and 2909 were made within 45 days of delivery of the goods and otherwise satisfy the requirements of Section 547(c)(2) and the delivery of goods to the debtor of an aggregate value of $51,151.02 made subsequent to the alleged preferential payments constitute new value for purposes of Section 547(c)(4) which more than offsets the amount of payments sought by the trustee which were not within the ambit of Sections 547(c)(2). The trustee's complaint is denied.

Separate judgment for the Bank consistent herewith shall be entered with each party to bear his or its own costs and attorney fees in these proceedings. Pursuant to Bankruptcy Rule 752 this Memorandum Opinion contains the Court's Findings of Fact and Conclusions of Law and shall not be separately stated.