## In re 360NETWORKS (USA) INC., et al., Debtors.

The Official Committee of Unsecured Creditors of 360networks (USA) Inc., et al., and 360networks (USA) Inc., by and through the Official Committee of Unsecured Creditors of 360networks (USA) Inc., et al., Plaintiffs,

v.

U.S. Relocation Services, Inc., Defendant.

Bankruptcy No. 01–13721 ALG.
Adversary No. 03–03127 ALG.

United States Bankruptcy Court, S.D. New York.

Dec. 19, 2005.

Dreier LLP, By Norman N. Kinel, Esq., Terence D. Watson, Esq., Timothy Solomon, Esq., New York City, for the Plaintiffs.

Dombroff & Gilmore, By Raymond L. Mariani, Esq., Dennis French, Esq., Karen Berberich, Esq., Cecilia Littleton, Esq., Lake Success, NY, for Defendant SIRVA Relocation LLC, successor by merger to U.S. Relocation Services, Inc.

## MEMORANDUM OF OPINION

ALLAN L. GROPPER, Bankruptcy Judge.

Before the Court is a motion for summary judgment filed by defendant U.S. Relocation Services, Inc., now known as SIRVA Relocation LLC ("USRS"), and a cross-motion for summary judgment filed by plaintiffs 360networks (USA), Inc. and the Official Committee of Unsecured Creditors of 360networks (USA), Inc. and affiliated debtors (collectively, the "Debtors"). The parties dispute whether certain payments made by one or more of the Debtors to USRS may be avoided and recovered as preferential transfers pursuant to §§ 547 and 550 of the Bankruptcy Code.

## Background

The Debtors were providers of telecommunications services. USRS is a relocation management company that handles the relocation of approximately 15,000 employees of client companies each year. In September 2000, USRS and one of the Debtors entered into an Agreement for Relocation Services (the "Agreement") pursuant to which the Debtors retained USRS to administer their employee relocation benefits plan. Under the Agreement, the Debtors designated employees for whom USRS agreed to provide a specific range of relocation services, including services relating to home marketing, mortgage financing, temporary living, buying and renting assistance, and household goods management. Under the Agreement, USRS could not make any independent determinations as to the benefits an employee was entitled to receive or the nature of the services that the Debtors specified for their eligible employees.

In furtherance of its obligations under the Agreement, USRS performed some of the services itself and hired vendors to carry out other aspects of the relocation process. It charged the Debtors service fees related to its subcontracts with these vendors. In addition, the Agreement provided for the Debtors to pay USRS a specified fee for relocating each employee. The terms of the Agreement provided that USRS could advance relocation benefits to the employees or pay vendors for the benefits, and then invoice the Debtors for reimbursement. The Agreement recites, "It is expressly understood that USRS shall be advancing on behalf of the Company significant sums of money under this Agreement," and that if USRS deemed itself "insecure concerning the repayment by the Company of monies under this Agreement," it could suspend any further advances until it received evidence of fi-

nancial security. (Agreement, sec. 7.) [1]

The Debtors' employees continued to perform throughout the period that the Debtors were making payments to USRS on their behalf. The names of the same employees show up on multiple invoices as recipients of relocation benefits, indicating that USRS would (for example) advance or pay the costs of an employee's house-hunting trip to a new location and later advance or pay the costs relating to the employee's sale of a former residence. It appears that employees were obligated to work for the Debtors for one year after their relocation or to repay all or a part of the expenses incurred to relocate them. (Aff. of Jeffrey Margolis, Senior Counsel at USRS, ¶ 18.) [2] If USRS advanced certain costs to an employee—an advance in contemplation of the sale of the employee's old residence, for example—it would be entitled to reimbursement from the proceeds of the sale of that residence, which it was contractually obligated to return to the Debtors if they had already fronted the expense. (Agreement, Ex. A, sec.D.)

USRS' relationship with the Debtors lasted from September 2000 until April 2002, during which time USRS administered relocation benefits for approximately 100 employees. (Aff. of John Buckley, Senior Accountant at USRS, ¶ 6.) USRS billed the Debtors on a monthly basis, issuing a total of ten invoices. During the 90 days preceding the Debtors' voluntary bankruptcy filing on June 28, 2001, the Debtors made six payments to USRS under the Agreement in the aggregate sum of $2,684,090. Of this sum, $1,984,090 constituted payment of eight invoices that the Debtors had issued in that amount.[3] In addition, at the insistence of USRS, on May 20, 2001, the same day it paid the February and March invoices, the Debtors advanced $700,000 to prepay the purchase price of a home of a high-level employee and, apparently by mistake, advanced an additional $121,048.91, which was applied to the payment of subsequent invoices. In the complaint, the Debtors are seeking to recover $1,836,014.09 (the "Payments"), which nets out the additional $121,048.91 that was advanced on May 20, 2001. The Debtors are thus not attempting to recover either the advance of $121,048.91 or the advance of $700,000.[4] USRS has calculated that of the $1,984,000 paid on the eight invoices, $1,820,315.03 reimbursed USRS for funds paid or advanced on behalf of the Debtors' employees, while $128,783.41 constituted fees charged by USRS and $34,991.56 constituted interest charged by

1. Based on the record, it appears that USRS' practice of advancing funds on behalf of relocating employees is typical in the employee relocation industry.

2. See also Dep. of Jayne Hart, the Debtors' Vice President for Human Resources, at 42–43, 51. Nevertheless, there is no evidence in the record as to an employee's obligation to repay to USRS any amounts advanced by USRS to the employee that the Debtors failed to pay.

3. The invoices were dated and paid as follows: (i) invoices for December 2000 and January 2001 in the aggregate amount of $394,814.33 were both paid on April 24, 2001; (ii) invoices for February and March 2001 in the aggregate amount of $566,551.09 were overpaid ($687,600.00) on May 20, 2001; (iii) invoice for April 2001 in the amount of $263,369.89 was partially paid ($246,118.50) on June 8, 2001; (iv) invoice of May 2001 in the amount of $270,263.97 was partially paid ($179,432.61) on June 13, 2001; (v) first June invoice in the amount of $252,487.40 was partially paid ($238,062.28) on June 18, 2001; and (vi) second June invoice in the amount of $236,603.32 was slightly overpaid on June 21, 2001 ($238,-062.28).

4. USRS claims that the Debtors are seeking the additional $121,048.91, but the Debtors' complaint does not seek this amount, and the complaint governs.

USRS on the funds that it had previously advanced to or for the benefit of the employees and the Debtors.

There is clear evidence in the record that during the period prior to the Debtors' bankruptcy, USRS put pressure on the Debtors, including commencing collection efforts, in an attempt to induce the Debtors to pay the invoices that were overdue. For example, prior to the first of the contested invoice payments on April 24, 2001, USRS demanded that payments be made by wire transfer and required the Debtors to fax copies of checks so that USRS could verify that payments were en route. By email dated April 26, 2001, the USRS controller confirmed its refusal to advance funds for the purchase of the home of a high-level Debtor officer based on "payments from 360 hav[ing] not occurred in a timely manner" and "the recent financial news surrounding 360." Later, on June 6, 2001, USRS sent an email to the Debtors stating, "I hope that we can wrap up the financial issue to a mutually agreeable plan as soon as possible, *so that services are not disrupted for too long.*" (Aff. of Jayne Hart, Exs. C, D, E.) (emphasis added).

After the Debtors' chapter 11 petitions were filed, the parties continued to perform under the Agreement. There is no indication in the record that the Debtors' employees failed to relocate in accordance with their commitments or to provide valuable services to the Debtors. It also appears that during the post-petition period USRS, in accordance with the Agreement, refunded to the Debtors $689,598 that represented the proceeds of the sales of the residences of three executives who had relocated. On October 2, 2002, the Debtors confirmed a plan of reorganization that provided, among other things, that certain executory contracts not previously assumed would be rejected. In accordance therewith, the Agreement was rejected as of the confirmation date.

On May 6, 2003, the Plaintiffs commenced this adversary proceeding seeking the avoidance, recovery and turnover of the Payments as preferential transfers under Bankruptcy Code §§ 547 and 550.

## Discussion

In accordance with Bankruptcy Rule 7056, which incorporates Fed.R.Civ.P. 56, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Morenz v. Wilson–Coker*, 415 F.3d 230, 234 (2d Cir.2005). The moving party bears the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also *Ames Dep't Stores, Inc. v. Wertheim Schroder & Co., Inc.*, 161 B.R. 87, 89 (Bankr.S.D.N.Y 1993). A fact is considered material if it might affect the outcome of the suit under governing law. See *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The fact that both parties have moved for summary judgment does not establish that there are no material facts in dispute. See *Kam Hing Enters., Inc. v. Zheng Zhang USA, Inc.*, 2003 WL 22966313, at *7 (S.D.N.Y.

2003); *Hachtel v. Citibank, N.A.,* 334 F.Supp.2d 315, 321 (E.D.N.Y.2004).

It is the Debtors' position that the Payments constitute preferential transfers that *prima facie* may be avoided under § 547 and recovered under § 550 of the Bankruptcy Code. USRS has raised three defenses: (i) USRS, acting as an agent of the Debtors in paying relocation expenses, functioned as a mere "conduit" in passing the Payments along to the Debtors' employees and cannot be deemed an "initial transferee" for purposes of § 550(a)(1); (ii) the Debtors received contemporaneous new value within the meaning of § 547(c)(1) for each Payment in the form of their employees' continued services; and (iii) the Payments were made and received in the ordinary course of business under § 547(c)(2).[5]

■ Each of USRS' defenses is dealt with below. In addition, USRS asserts that it has no liability because it is not a "creditor," and that the transfer was not to or for the benefit of a creditor as required by § 547(b)(1). USRS relies on *Official Comm. of Unsecured Creditors v. U.S. Dep't of Labor (In re Dairy Stores),* 148 B.R. 6 (Bankr.D.N.J.1992) and *American Envt'l Servs. Co. v. Blue Cross/Blue Shield (In re American Envt'l Servs. Co.),* 164 B.R. 462 (Bankr.W.D.N.Y.1994). In each of these cases, the Court found that the defendant (the U.S. Department of Labor in one case and Blue Cross as administrator of the debtor's health plan in the other) acted as agent for the debtor's employees, receiving and disbursing funds payable to the employees as a "custodian" and "administrator," *Dairy Stores,* 148 B.R. at 9, or "remitting agent," *American Envt'l Servs.,* 164 B.R. at 464. In the instant case, as further discussed below, USRS had a claim of its own as evidenced by its own invoices to the Debtors, and it has introduced no evidence that it acted as an agent of the employees. The Payments made to it were to or for the benefit of a creditor under § 547(b)(1). See *Hunter v. S.K. Austin Co. (In re Beck),* 25 B.R. 947, 952 (Bankr.N.D.Ohio 1982).

## I. Conduit Defense

■ "The trustee of a bankrupt estate has broad powers under the Bankruptcy Code to avoid certain transfers of property or assets made by the debtor either after or shortly before the filing of the bankruptcy petition." *Christy v. Alexander & Alexander of New York, Inc. (In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey),* 130 F.3d 52, 55 (2d Cir.1997).[6] Section 547(b) of the Bankruptcy Code sets forth the elements that a trustee must establish in order to avoid as preferential the prepetition transfer of "any interest of the debtor in property."[7] Section 547(c) then sets forth sev-

---

**5.** USRS raises no issue with respect to the Debtors' insolvency, which is presumed under § 547(f).

**6.** Debtors in possession, such as the Debtors, exercise the avoidance powers of a trustee. 11 U.S.C. § 1107(a). In this case, the Committee was authorized to pursue the avoidance claims of the Debtors. See *In re STN Enterprises,* 779 F.2d 901, 904 (2d Cir.1985).

**7.** Section 547(b) provides in pertinent part:

[T]he trustee may avoid any transfer of an interest of the debtor in property:

(1) to or for the benefit of a creditor;
(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
(3) made while the debtor was insolvent
(4) made—
 a. on or within ninety days before the date of the filing of the petition; or
 b. between ninety days and one year before the date of the filing of the petition, of such creditor at the time of such transfer was an insider; and
(5) that enables such creditor to receive more than such creditor would receive if—

eral express defenses. As noted above, two are invoked by USRS: an otherwise preferential transfer may not be avoided to the extent it constitutes (i) a contemporaneous exchange of new value to the debtor or (ii) a payment in the ordinary course of business. 11 U.S.C. § 547(c)(1) and (2). In addition to the defenses specified in § 547(c), courts have implied several other defenses, one of which, the conduit defense, arises out of the relationship between § 547 and § 550 of the Bankruptcy Code and is raised by USRS.

Section 550 allows the trustee to recover the transferred property or its value to the extent the trustee has successfully invoked the avoidance powers of § 547.[8] Section 550(a)(1) provides that either an "initial transferee" or "the entity for whose benefit such transfer was made" is liable for an avoided transfer. 11 U.S.C. § 550(a)(1); see *In re Moskowitz*, 85 B.R. 8, 10 (E.D.N.Y.1988). By contrast, a "mediate" or "immediate" transferee (a subsequent transferee) has an additional defense that is not ordinarily available to the initial transferee. Under § 550(b)(1), a trustee may not recover an otherwise avoidable transfer from a subsequent transferee "that takes for value, including satisfaction or securing a present antecedent debt in good faith, and without knowledge of the voidability of the transfer avoided." See *Bonded Fin. Serv. v. European Am. Bank*, 838 F.2d 890, 896–97 (7th Cir.1988); *Tese–Milner v. Brune (In re Red Dot Scenic, Inc.)*, 293 B.R. 116, 118 (S.D.N.Y.2003), *aff'd*, 351 F.3d 57 (2d Cir.2003); *Sec. Investor Protection Corp. v. Stratton Oakmont*, 234 B.R. 293, 312 (Bankr.S.D.N.Y. 1999). Whether a "transferee" under § 550 is an initial or subsequent transferee therefore has significant consequences with respect to liability and available defenses.

The Bankruptcy Code does not define the term "transferee," much less "mediate" or "initial transferee," and the legislative history is not helpful. *Bonded Fin.*, 838 F.2d at 893. The Second Circuit's leading case on transferee status under § 550 is *Finley, Kumble*, where a debtor law firm had purchased malpractice insurance through its insurance broker, which had forwarded the debtor's premium payments to the insurer. The trustee sued only the broker. The Circuit Court noted that the broker, upon receipt of the funds, did not have the right to put them to its own use but was obligated to transmit them to the insurer. 130 F.3d at 59. The Court held that the broker's role in the transaction was that of a mere "conduit" and that it was not liable for the payments as an initial transferee under § 550. *Id.*

In *Finley, Kumble*, the Circuit Court adopted the reasoning of the Seventh Circuit in the *Bonded Financial* case, noting that the "logic" of *Bonded Financial* had been widely accepted. See *Finley, Kumble*, 130 F.3d at 57–58, citing *Malloy v. Citizens Bank (In re First Sec. Mortgage Co.)*, 33 F.3d 42, 44 (10th Cir.1994); *In re Coutee*, 984 F.2d 138, 140–41 (5th Cir. 1993); *Danning v. Miller (In re Bullion Reserve of North America)*, 922 F.2d 544,

a. the case were a case under chapter 7 of this title;
b. the transfer had not been made; and
c. such creditor received payment of such debt to the extent provided by the provisions of this title.

8. Section 550(a) provides in pertinent part:

[T]he trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.

548–49 (9th Cir.1991); *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196, 1199–1200 (11th Cir.1988).[9] In *Bonded Financial,* the Seventh Circuit had considered whether a bank was an "initial transferee" under § 550(a). The bank had received a check with instructions to deposit it into a customer's account, and the customer later used the funds to pay off a debt owed to the bank. Although the check was payable to the bank's order, the Court held that the bank was not the initial transferee but became a subsequent transferee only when the funds were used to pay down the loan. In reaching its decision, the Court found that a party would not be considered the initial transferee if it did not have dominion or control over the transferred property; it held that the "minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes." *Bonded Fin.,* 838 F.2d at 894. The Court elaborated on this requirement, stating that "an entity does not have legal dominion over the money until it is free to invest that money in lottery tickets or uranium stocks if it wishes." *Id.;* see also *Hooker Atlanta Corp. v. Hocker,* 155 B.R. 332, 338 (Bankr. S.D.N.Y.1993) ("[T]he initial transferee is one who is legally able to use the money for his own purposes.").

Although USRS argues that it was a "mere conduit" of funds intended to benefit the employees, the record demonstrates that, with the exception of the $121,048.91 it advanced on May 20, 2001 (and that the Debtors have not demanded in the complaint), it provided and paid for the relocation benefits *prior to* receiving the Payments and therefore had complete dominion and control over the Payments, and the right to apply them as it wished, upon receipt. The very term "conduit" indicates that USRS cannot sustain that defense as to Payments that it received from the Debtors in reimbursement for advances it had already made and for which it gave credit to the Debtors. USRS was not a conduit to any third party with respect to such funds. If it chose, it had the right, in the words of *Bonded Financial,* to invest these proceeds in lottery tickets or uranium stocks. It was not under any contractual or other obligation to use them for the benefit of the Debtors' employees. Moreover, the conduit cases emphasize that a conduit does not intend to and does not give credit to the debtor, a factor that is usually a hallmark of a transaction that can be avoided as a payment on an antecedent debt and a preference under § 547. See *Dairy Stores,* 148 B.R. at 9 ("A preferential transfer ... cannot exist in the absence of credit."); *Timber Line, Ltd. v. E. Carolina Ship Agencies (In re Timber Line, Ltd.),* 59 B.R. 728, 731 (Bankr.S.D.N.Y.1986). A principal factor in the instant case is that USRS intended to give and in fact gave credit to the Debtors when it advanced

---

**9.** Other cases that have adopted the mere conduit test include *Bowers v. Atlanta Motor Speedway (In re Southeast Hotel Properties L.P.),* 99 F.3d 151 (4th Cir.1996); *Rupp v. Markgraf,* 95 F.3d 936 (10th Cir.1996); *First Nat'l Bank of Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.),* 974 F.2d 712 (6th Cir.1992); *Red Dot Scenic,* 293 B.R. at 119; *Leonard v. First Commercial Mortgage Co. (In re Circuit Alliance, Inc.),* 228 B.R. 225, 232 (Bankr.D.Minn.1998); *Robinson v. Home Sav. of Am. (In re Concord Senior Hous. Found.),* 94 B.R. 180 (Bankr.C.D.Cal.1988); *Moskowitz,* 85 B.R. at 11; *Gropper v. Unitrac, S.A. (In re Fabric Buys of Jericho, Inc.),* 33 B.R. 334, 337 (Bankr.S.D.N.Y.1983); *Geltzer v. D'Antona (In re Cassandra Group),* 312 B.R. 491, 496 (Bankr.S.D.N.Y.2004); *Stratton Oakmont,* 234 B.R. at 313; *In re Maxwell Newspapers, Inc.,* 151 B.R. 63, 70 (Bankr.S.D.N.Y.1993); *Salomon v. Nedlloyd, Inc.,* 59 B.R. 873, 875 (Bankr.S.D.N.Y.1986); see 5 Collier on *Bankruptcy* ¶ 550.02[4][a] (15th ed.2005).

the employees' expenses and sought reimbursement from the Debtors.

The foregoing is not to say that exercise of any dominion and control over transferred funds precludes an entity from invoking the conduit defense. In the words of the *Bonded Financial* Court, dominion and control is the *"minimum requirement"* for qualifying as an initial transferee. *Bonded Fin.*, 838 F.2d at 894 (emphasis added); see also *Rupp*, 95 F.3d at 942 ("merely because one has dominion and control of funds" does not make one a transferee). On the other hand, there are virtually no cases that allow the "mere conduit" defense where the transferee receives the funds in payment of an expense that the transferee has already advanced on the credit of the debtor. As the Court stated in *Lowry v. Security Pac. Bus. Credit, Inc. (In re Columbia Data Products, Inc.)*, 892 F.2d 26 (4th Cir.1989), "When a creditor receives money from its debtor to pay a debt, the creditor is not a mere conduit." 892 F.2d at 28.

In *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.)*, 848 F.2d 1196 (11th Cir.1988), cited by USRS, a bank, acting as a clearinghouse for the debtor, honored the debtor's check payable to a third party before receiving funds from the debtor to cover the amount of the check. The Circuit Court held that even though the bank had received the transfer after honoring the check, it did not have the requisite control of the funds to be considered an initial transferee under § 550(a) and enjoyed mere conduit status, 848 F.2d at 1201. However, in *Nordberg*, the Bank had paid out the funds only a brief period before it received reimbursement from the debtor and had not intended to give credit to the debtor. Thus the Court found "ample evidence in the record to support the finding that the transaction was effectively simultaneous." *Id.* at 1201; see also *In re Bullion Reserve of North America*, 922 F.2d at 549. In *Excello Press, Inc. v. Bowers, Inc. (In re Excello)*, 104 B.R. 924 (Bankr.N.D.Ill.1989), *aff'd in part rev'd on other grounds*, 120 B.R. 938 (N.D.Ill.1990), *rev'd on other grounds*, 967 F.2d 1109 (7th Cir.1992), it appears from the District Court opinion that the Bankruptcy Court had applied the *Bonded Financial* test and the conduit defense where "a portion" of the payments to a broker for medical insurance reimbursed a broker for insurance that had already been purchased. But no case has been found that has applied the "conduit" defense to transactions where the alleged "conduit" received repayment of funds that the conduit had advanced on behalf of and on the credit of the debtor a substantial period of time earlier.[10]

USRS has failed to identify any funds it passed directly on to employees as a "conduit," except for the funds that were prepaid on May 20, 2001 and are not demanded in the complaint. Accordingly, the conduit defense is not available to USRS with respect to the Payments it received from the Debtors reimbursing it

---

**10.** The Debtors also cite a clause in the Agreement that states that USRS was not an agent of the Debtors and claim that this clause precludes USRS from arguing that it was a mere conduit. This is not correct. As *Finley, Kumble* makes clear, an initial recipient's status as an agent is not dispositive in determining whether the recipient is a conduit or an initial transferee. The Second Circuit explained that whatever the relationship between the debtor and the initial recipient prior to the transfer at issue, it is the nature of the initial recipient's role in the transaction between the parties that is determinative of its liability. *Finley, Kumble*, 130 F.3d at 59. The existence of an agent-principal arrangement between a debtor and initial recipient may be relevant to the existence of a conduit defense, but it is not a prerequisite.

for funds already expended on behalf of the employees.[11]

## II. Contemporaneous Exchange for New Value Defense

Section 547(c)(1) of the Bankruptcy Code provides that:

> The trustee may not avoid under this section a transfer—
>
> (1) to the extent that such transfer was—
>
> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>
> (B) in fact a substantially contemporaneous exchange.

 Three elements are necessary: (i) the transfer must be for new value given to the debtor; (ii) the transfer must be intended to be a contemporaneous exchange; and (iii) the transfer must be in fact a substantially contemporaneous exchange. 11 U.S.C. § 547(c)(1); see *Stevenson v. Leisure Guide of Am., Inc. (In re Shelton Harrison)*, 202 F.3d 834, 837 (6th Cir.2000); *Tyler v. Swiss Am. Sec., Inc. (In re Lewellyn & Co., Inc.)*, 929 F.2d 424, 429 (8th Cir.1991); *Computer Person-alities Sys. v. Aspect Computer (In re Computer Personalities Sys., Inc.)*, 320 B.R. 812, 818–19 (E.D.Pa.2005); *Gray v. Oppenheimer & Co. (In re Molten Metal Tech., Inc.)*, 262 B.R. 172, 176 (Bankr. Mass.2001); *Cimmaron Oil Co. v. Cameron Consultants, Inc.*, 71 B.R. 1005, 1008 (N.D.Tex.1987). The purpose of the exception is "to encourage creditors to continue to deal with troubled debtors," and transfers protected under § 547(c)(1) are not preferential "because other creditors are not adversely affected if the debtor's estate receives new value." *Jones Truck Lines, Inc. v. Central States, S.E. and S.W. Areas Pension Funds (In re Jones Truck Lines, Inc.)*, 130 F.3d 323, 326 (8th Cir.1997); 5 Collier on *Bankruptcy* ¶ 547.04[1][b] (15th ed.2005).[12]

We will consider, first, whether new value was given to the Debtors and second, whether the Payments were intended to be and were in fact substantially contemporaneous with the alleged "new value."

### A. New Value

 The first question is whether new value was provided to the Debtors in exchange for the Payments. New value is

---

**11.** *A fortiori*, the "mere conduit" defense is unavailable to USRS with respect to the portion of the Payments constituting its own fees and interest. The Court in *Finley, Kumble* left open the question whether a conduit would be liable for that portion of payments it received that it did not pass through to a third party but retained on its own account, 130 F.3d at 59, but many cases have held that "[w]here a 'mere conduit' retains possession of some portion of the funds, he will be held liable up to the amount which he retains." *Maxwell Newspapers*, 151 B.R. at 70; see also *Commercial Recovery, Inc. v. Mill Street, Inc. (In re Mill Street, Inc.)*, 96 B.R. 268 (9th Cir. BAP 1989) (collection agency was the initial transferee for that portion of payment it received from the debtor which constituted its fee); *Timber Line*, 59 B.R. at 730 (transferred funds within profit margin preferential).

**12.** USRS did not initially plead "contemporaneous exchange" as an affirmative defense in its answer to the complaint. The Debtors have objected to its motion to amend its answer, arguing that any such amendment would be "futile" because the defense has no merit. For the reasons stated hereafter, it cannot be determined on these motions whether the defense has merit. Since the Debtors have not demonstrated any cognizable prejudice from allowing the amendment, and Rule 15 provides that leave to amend "shall be freely given when justice so requires," the motion to amend is granted. *U.S. v. Continental Illinois Nat'l Bank & Trust Co.*, 889 F.2d 1248, 1255 (2d Cir.1989).

defined in § 547(a)(2) to mean "money or money's worth in goods, services or new credit... but does not include an obligation substituted for an existing obligation." Forbearance alone does not constitute new value. *In re Mid Atlantic Fund, Inc.*, 60 B.R. 604, 609 (Bankr. S.D.N.Y.1986); *In re McLean Industries, Inc.*, 132 B.R. 247, 263–64 (Bankr.S.D.N.Y. 1991), *rev'd on other grounds*, 30 F.3d 385 (2d Cir.1994); *Official Comm. of Unsecured Creditors of 360networks (USA), Inc. v. AAF–McQuay, Inc. (In re 360networks (USA), Inc.)*, 327 B.R. 187, 191 (Bankr.S.D.N.Y.2005).

▮ In the instant case, the "new value" was provided by the Debtors' employees, not USRS, but there is no requirement in § 547(c)(1) that the new value be provided to the debtor by the preference defendant, and it may be provided by a third party. See *Jones Truck Lines*, 130 F.3d at 327–28; *In re Kumar Bavishi & Assocs.*, 906 F.2d 942, 945 (3d Cir.1990); *In re E.R. Fegert, Inc.*, 887 F.2d 955, 959 (9th Cir. 1989); *In re Fuel Oil Supply & Terminaling, Inc.*, 837 F.2d 224, 228–30 (5th Cir. 1988). This principle has often been applied in the area of employee services. In *Jones Truck Lines* the issue was whether the debtor's current benefit payments to a union trust were given in exchange for new value in the form of services performed by the debtor's employees. The Circuit Court held that they were, finding that:

> The "new value" Jones received for paying current wages and benefit contributions during the ninety-day preference period were the services its employees continued to provide.... There are countless transactions in which a debtor transfers property to a creditor in exchange for contemporaneous new value provided "to the debtor" by a third party.

130 F.3d at 327. Similarly, in *Peltz v. Hartford Life Ins. Co. (In re Bridge Information Systems, Inc.)*, 321 B.R. 247, 256 (Bankr.E.D.Mo.2005), the issue was whether a debtor's reimbursement for disability benefits that the defendant insurance company had paid to employees the previous week was protected by reason of the "contemporaneous exchange" defense. The Court held that the payments to the insurer were exchanges for new value given by the employees.

Nevertheless, as noted above, forbearance does not constitute new value. The Debtors argue that in *Jones Truck Lines*, the payments were for current benefits, the new value was the employees' current performance, and the employees' current services did not constitute new value for past due amounts. Indeed, in *Jones Truck Lines* the Court explicitly considered the question whether the alleged new value provided by the employees merely constituted forbearance or new value in the form of services. It found that if the employer had paid past due benefits, responding to a strike threat, "that transfer [would not be] for new value" because there would only have been forbearance from striking on the part of the employees. 130 F.3d at 327. It distinguished the payment of past benefits from services provided for current benefits, stating, "If the employer also resumes paying the employee's current salary and benefits when due, and the employee keeps working, those current payments are contemporaneous exchanges for 'new value,' the employees' continuing services." *Id.*

The principle that new value is not provided if the contract party merely forbears from canceling or ceasing performance under a contract has been applied under circumstances that are very similar to those in the present case. In *Drabkin v. A.I. Credit Corp.*, 800 F.2d 1153 (D.C.Cir.

1986), the trustee claimed a preference from an undersecured creditor who had financed insurance premiums for the debtor's benefit. The finance company argued that new value was provided by the uninterrupted provision of insurance by the third-party insurer. The Circuit Court found that the insurance policy had been contracted for, that it gave the debtor a year of insurance coverage, and that the finance company would have had to cancel the policy and foreclose in order to interrupt the benefit. The Court held that this "amounted to no more than forbearance" and was not new value. 800 F.2d at 1157; see also *In re Paris Industries, Corp.*, 130 B.R. 1, 4–5 (Bankr.D.Me.1991).[13]

█ As discussed above, both parties have moved for summary judgment on the "contemporaneous exchange for new value" defense, but the record is not sufficient to demonstrate whether the employees provided "new value" to the Debtors in exchange for the challenged Payments to USRS. It is alleged that there was an obligation on the employees to work for the Debtors for a year in order to retain their relocation benefits, implying that their performance was locked in by an agreement. If so, under *Drabkin*, the employees' failure to repudiate the contract would not constitute new value. On the other hand, neither party has provided much information on the employees' agreement, and if the employees continued to provide services and to relocate, as long as USRS continued to be paid, it might plausibly be argued that the employees' relocation constituted "new value" for the Payments.[14]

It is impossible to state on this record whether the Debtors received new value or only the rights to which they were already contractually entitled. Both motions for summary judgment must be denied.

## B. Substantially Contemporaneous

Assuming that new value was provided by the Debtors' employees, the second question is whether that new value was and was intended to be substantially contemporaneous with the challenged Payments. At first glance, it seems obvious that USRS' performance was not and was not intended to be a contemporaneous exchange. As the Debtors assert and the record indicates, USRS and the Debtors intended that USRS would advance relocation benefits to or on behalf of the Debtors' employees, and the Payments were in fact credit transactions as far as USRS and the Debtors were concerned. Courts have consistently held that payments on account of an antecedent debt are not contemporaneous exchanges. See *Sapir v. Keener Lumber Co. (In re Ajayem Lumber Corp.)*, 143 B.R. 347, 352 (Bankr.S.D.N.Y.1992) (transfer intended by the parties to be for or on account of antecedent debt was not a contemporaneous exchange for new value given to the debtor); *In re Alpex Computer Corp.,* 60 B.R. 315, 319 (Bankr. D.Colo.1986) (payment for an overdue antecedent debt was not new value). On the other hand, USRS can plausibly argue that the employees' performance—relocation—was substantially contemporaneous with the Payments and was intended to be substantially contemporaneous.

---

**13.** The result would be different if the finance company had been fully secured. *Schwinn Plan Comm. v. Transamerica Ins. Fin. Corp. (In re Schwinn Bicycle Co.)*, 200 B.R. 980 (Bankr.N.D.Ill.1996).

**14.** New value involving the provision of services is given on the date when the services are performed. *Webster v. Harris Corp. (In re NETtel Corp., Inc.)*, 319 B.R. 290, 295 (Bankr. D.D.C.2004), quoting Collier on *Bankruptcy* ¶ 547.04[4][c] (15th ed.2003).

Two issues are raised. First, can USRS rely on the employees' performance to demonstrate that there was substantially contemporaneous performance and that a contemporaneous performance was intended? Second, did the parties intend that the employees' performance be substantially contemporaneous with the Debtors' payments to USRS?

■ The answer to the question whether USRS can rely on the employees' performance and intentions in connection with its § 547(c)(1) defenses is seemingly provided by the words of the statute. Section 547(c)(1) provides that a transfer must be intended by the debtor and the creditor "to *or* for whose benefit such transfer was made" to be a substantially contemporaneous transfer, and that it must be in fact a substantially contemporaneous exchange. (emphasis added). The statute speaks in the disjunctive, requiring intent from the debtor and either the creditor to whom the transfer was made or the creditor for whose benefit the transfer was made. By the plain words of the statute, the defense ought to be available if either USRS as the transferee *or* the Debtors' employees as the parties for whose benefit the transfers were made can raise the defense. As the Court stated in *Jones Truck Lines*, with respect to the "new value" aspect of the § 547(c)(1) defense, the "analysis is the same whether the creditor claiming § 547(c)(1) protection is the employee who

continued to work in exchange for current wages, or the employee benefit fund to which current benefits were paid on the employee's behalf." 130 F.3d at 327; see also *In re Bagwell*, 29 B.R. 461, 466 (Bankr.D.Or.1983) (where the trustee brought suit against a bank, which had received certain payments as assignee of the rights of its borrower, the Court held that the bank was the initial transferee, the borrower was the party for whose benefit the transfer was made, and the bank could assert the defenses of the borrower, its assignor).

The conclusion that the contemporaneous exchange defense should be available on the same terms to a creditor to or for whose benefit a transfer was made is bolstered by the relationship between § 547 and § 550. As discussed above in another context, § 550(a)(1) provides that a transfer that is avoided under § 547 can be recovered from either the initial transferee or the entity "for whose benefit such transfer was made." The liability of these two parties is coextensive. See *Levit v. Ingersoll Rand Fin. Corp. (In re Deprizio Constr. Co.)*, 874 F.2d 1186 (7th Cir.1989), where the Circuit Court held that the liability of the transferee and the entity "for whose benefit" the transfer was made is coextensive, and that "[a] single payment therefore is one 'transfer,' no matter how many persons gain thereby." 874 F.2d at 1196 (footnote omitted).[15] If the liability of

**15.** *Deprizio* was followed by many other courts. See *Mendelsohn v. Sequa Fin. Corp. (In re Frank Santora Equip. Corp.)*, 231 B.R. 486, 490 (E.D.N.Y.1999); *Galloway v. First Alabama Bank (In re Wesley Indus., Inc.)*, 30 F.3d 1438, 1441 (11th Cir.1994); *Official Unsecured Creditors Committee v. U.S. National Bank of Oregon (In re Sufolla, Inc.)*, 2 F.3d 977, 980 (9th Cir.1993); *T.B. Westex Foods, Inc. v. FDIC (In re T.B. Westex Foods, Inc.)*, 950 F.2d 1187 (5th Cir.1992); *Ray v. City Bank & Trust Co. (In re C–L Cartage Co.)*, 899 F.2d 1490 (6th Cir.1990). It took two amend-

ments to the Bankruptcy Code to overturn *Deprizio*. Congress first amended § 550 to add § 550(c), and when that did not completely eradicate the result, it added new § 547(i). See *Official Comm. of Unsecured Creditors of ABC–NACO, Inc., ex rel ABC–NACO, Inc. v. Bank of Am., N.A. (In re ABC–NACO, Inc.)*, 331 B.R. 773, 778–79 (Bankr. N.D.Ill.2005), quoting H.R.Rep. No. 109–31, at 144 (2005), U.S.Code Cong. & Admin.News 2005, pp. 88, 202. However, both amendments relate to the applicable preference period and do not otherwise affect the general

an initial transferee and the entity for whose benefit the transfer was made is coextensive, there is no principled reason why they should not each be able to raise a defense that might be deemed personal to the other.[16]

Were the employees creditors for whose benefit the transfers were made? The most obvious example of such an entity is a guarantor. See *Bonded Fin.*, 838 F.2d at 894. Other parties that have qualified under § 547(c)(1) and § 550(a)(1) as entities for whose benefit a transfer was made include a debtor's employees (*Jones Truck Lines*, 130 F.3d 323), issuers of letters of credit (*In re Fuel Oil Supply & Terminaling Inc.*, 837 F.2d 224), a debtor's supplier (*In re Food Catering and Hous., Inc.*, 971 F.2d 396 (9th Cir.1992)), and a creditor with a security interest in the transferred property (*Am. Bank of Martin County v. Leasing Serv. Corp. (In re Air Conditioning, Inc.)*, 845 F.2d 293 (11th Cir.1988)). In all cases, there must be a direct or intended benefit from the challenged transfer itself and not from a general course of dealing. See *In re Fuel Oil*

*Supply*, 837 F.2d at 228; *Reily v. Kapila (In re Int'l Mgmt. Assoc.)*, 399 F.3d 1288, 1293 (11th Cir.2005).[17]

■ In this case the continuing tripartite relationship among the Debtors, USRS and the employees demonstrates that the employees were parties for whose benefit the transfers were made. The employees were direct and not merely incidental beneficiaries of the Agreement.[18] On the other hand, the record is not at all clear whether the employees' performance was intended to be and was in fact a substantially contemporaneous exchange for the Payments. As mentioned above, success on a contemporaneous exchange defense requires a finding that the debtor and the transferee or third-party beneficiary intended a substantially contemporaneous exchange for new value. See *Harrah's Tunica Corp. v. Meeks (In re Armstrong)*, 291 F.3d 517, 525 (8th Cir.2002) ("The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an ex-

rule of coextensive liability between transferees and entities for whose benefit the transfer was made.

16. This is also the general rule in the area of suretyship, where a defense available to a principal obligor may be raised by a guarantor, who is subrogated to the rights of the principal obligor to the extent it has not waived any such defenses. See *Rhode Island Hospital Trust Nat'l Bank v. Ohio Casualty Co.*, 789 F.2d 74 (1st Cir.1986); *Union Switch & Signal, Inc. v. St. Paul Fire & Marine Ins. Co.*, 226 F.R.D. 485, 490 (S.D.N.Y.2005); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Alexander*, 728 F.Supp. 192, 198 (S.D.N.Y.1989); Restatement (Third) of *Suretyship & Guarantee* § 34 (1996).

17. *In re Fuel Oil Supply & Terminaling Inc.* is instructive. It involved a tripartite situation where two banks had issued letters of credit to the debtor's gasoline supplier and had taken a security interest in certain of the debtor's collateral. The letters named the supplier as

the beneficiary and the banks were fully secured. The supplier provided gasoline to the debtor and instead of calling on the letter of credit, the supplier accepted payment directly from the debtor during the preference period, with every dollar the debtor paid to the supplier releasing a dollar of collateral that had been pledged to the banks. The Court found that the supplier had a valid "contemporaneous exchange" defense, where the banks gave new value in the form of the reduction of their lien, which was contemporaneous with the challenged payment, noting that the parties intended that "the fulfillment of [the debtor's] obligation to [the supplier] would result in the Banks' contemporaneous release of [the debtor's] assets." *Id.* at 228.

18. Except for that portion of the Payments that reimbursed USRS for its fees and interest charges, the Payments are considered income to the employees, not USRS, for tax purposes.

change."). The existence of such intent under § 547(c)(1) is a question of fact. *Id.; Lewellyn,* 929 F.2d at 427; *In re Spada,* 903 F.2d 971, 975 (3d Cir.1990). The record is barren of evidence as to whether the parties intended that the Payments be conditioned on the employees' performance of their agreement to relocate.

USRS argues that there is no requirement that a "contemporaneous exchange" be an instantaneous exchange, and performance on one side may take place at the end of a contractual period. See *Everlock Fastening Sys. v. Health Alliance Plan (In re Everlock Fastening Systems, Inc.),* 171 B.R. 251, 255 (Bankr. E.D.Mich.1994) (debtor's payment of monthly insurance premium was a substantially contemporaneous exchange for new value in the form of an insurance company's provision of employee healthcare services throughout that month); *Sapir v. Eli Haddad Corp. (In re Coco),* 67 B.R. 365, 371 (Bankr.S.D.N.Y.1986) (debtor's monthly rent payment was a substantially contemporaneous exchange for new value in the form of landlord's provision of premises throughout that month). As the Court held in *Pine Top Ins. Co. v. Bank of Am. Natl. Trust & Sav. Assoc.,* 969 F.2d 321, 328 (7th Cir.1992), "[t]he modifier 'substantial' makes clear that contemporaneity is a flexible concept which requires a case-by-case inquiry into all relevant circumstances." See also *Lindquist v. Dorholt (In re Dorholt),* 224 F.3d 871, 874 (8th Cir.2000); *HLI Creditor Trust v. Hyundai Motor Co. (In re Hayes Lemmerz Int'l, Inc.),* 329 B.R. 136, 140 (Bankr. D.Del.2005). In *Bridge Information Systems,* relied on by USRS, the issue was whether a debtor's reimbursement for disability benefits the defendant had paid to employees the previous week was a contemporaneous exchange. The Court ob-

served that a debtor can receive the new value either before or after the debtor remits the preferential transfer. 321 B.R. at 256. Noting that "the determination of whether the exchange was in fact contemporaneous is a flexible one" and that the issue was not only proximity in time "but also whether the exchange occurred within the time frame established by the parties' agreement," the Court held that the payments were protected. *Id.* at 256–57, citing *Dorholt,* 224 F.3d at 874 and *Lewellyn,* 929 F.2d at 428 (course of dealings between parties can show contemporaneous intent).

Nevertheless, as the Debtors point out, none of the above cases involved as long a period of time as between the invoicing by USRS and the payment by the Debtors of the invoices—in some cases four months later. For example, the alleged preferences in *Bridge Information Systems* were made in fairly close proximity in time to the payments to the employees, and the Court did not consider the fact pattern raised in this case, where the preference defendant explicitly agreed to advance costs for the benefit of the employees for a cognizable period of time. Similarly, in *Jones Truck Lines,* also relied on by USRS, the Court distinguished between payments to the union trust made on account of current obligations and payments made for past due obligations.

As with the "new value" aspect of the defense, the record is not adequate to determine whether the challenged Payments were intended to be simultaneous with the employees' performance. The record does not indicate whether the employees had any knowledge of the Debtors' Payments to USRS or whether the Payments relieved the employees of an obligation to reimburse USRS for the benefits. Both motions for summary judgment on this issue must be denied, with one excep-

tion. USRS has apparently raised the contemporaneous exchange of new value defense only with respect to that portion of the Payments that reimbursed it for payments to or for the benefit of the employees, and not with respect to that part of the Payments that represented its fees and interest. (Mem. of Law in Support of Motion, at 13.) It is clear that USRS would not be able to sustain a contemporaneous exchange defense with respect to its own fees and charges for interest, and that portion of the Payments is not protected by § 547(c)(1).

### III. Ordinary Course of Business Defense

The final defense raised by USRS is that the Payments were made and received in the ordinary course of business. Section 547(c)(2) provides:

(c) The Trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms [19]

The burden is on the preference defendant to prove each element of § 547(c)(2) by a preponderance of the evidence. See 11 U.S.C. § 547(g); *Lawson v. Ford Motor Co. (In re Roblin Industries, Inc.),* 78 F.3d 30, 39 (2d Cir.1996). Although the Bankruptcy Code does not define "ordinary course of business," courts have relied on the legislative history, which states that the purpose of this defense "is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy." *Roblin,* 78 F.3d at 41, quoting H.R.Rep. No. 95–595 (1978) at 373, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329.

In determining whether a transfer is made in the ordinary course of business under § 547(c)(2), courts typically consider factors such as (i) the prior course of dealing between the parties, (ii) the amount of payment, (iii) the timing of payments, (iv) circumstances surrounding the payments, (v) the existence of any unusual debt collection practices, and (vi) changes in the means of payment. See *Official Comm. of Unsecured Creditors of Cyberrebate.com, Inc. v. Gold Force Int'l, Ltd. (In re Cyberrebate.com, Inc.),* 296 B.R. 639, 643 (Bankr.E.D.N.Y.2003); see also *Yurika Foods Corp. v. United Parcel Serv. (In re Yurika Foods Corp.),* 888 F.2d 42, 45 (6th Cir.1989); *Marathon Oil Co. v. Flatau (In re Craig Oil Co.),* 785 F.2d 1563, 1566 (11th Cir.1986). It is well settled that payments made as a consequence of economic pressure and debt collection practices not common in the industry are not in the ordinary course of business. See *Marathon Oil Co.,* 785 F.2d 1563 (unusual creditor pressure to compel payment was not in the ordinary course of business); *Florida Steel Corp. v. Stober (In re Indus. Supply Corp.),* 127 B.R. 62 (M.D.Fla.1991), *aff'd* 961 F.2d 1582 (11th Cir.1992) (unusual creditor pressure alone

---

**19.** Section 547(c)(2) has been revised by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–8, effective October 17, 2005. However, § 547(c)(2), as revised, is inapplicable as this case was filed before the effective date of the new Act. See Pub.L. No. 109–8, § 1406(b)(1).

could negate an ordinary course defense); *Gold Force Int'l, Ltd. v. Official Comm. of Unsecured Creditors of Cyberrebate.Com, Inc.*, 2004 U.S. Dist. LEXIS 2089 (E.D.N.Y. Feb. 10, 2004) (a creditor's collection efforts during the preference period could remove a payment from the scope of the ordinary course of business).

The record on these cross motions for summary judgment is adequate to demonstrate that the Payments to USRS do not fall within the definition of ordinary course of business as it has been construed. See *Jacobs v. Matrix Capital Bank (In re AppOnline.com, Inc.)*, 315 B.R. 259, 288 (Bankr.E.D.N.Y.2004), which was decided on cross-motions for summary judgment. As discussed above, USRS implemented various pressure tactics to induce the Debtors to pay invoices that were in some cases outstanding for considerable periods. An email of the USRS controller dated two days after the first two of the Payments acknowledged that "payments from 360 have not occurred in a timely manner," expressed concern about "the recent financial news surrounding 360" and confirmed that USRS would not advance substantial new funds to purchase the house of a relocating officer. (Aff. of Jayne Hart, Ex. D.) Even before the first Payments were made, USRS required the Debtors to pay by wire transfer and fax copies of checks awaiting approval so that USRS could verify that payments were en route. At USRS' request, the Debtors brought their account current by paying six out of eight outstanding invoices by wire transfer, which was inconsistent with the parties' prior course of dealing. An email of June 6, 2001 admits that services had been disrupted and expresses hope that "we can wrap up the financial issue to a mutually agreeable plan as soon as possible." (Aff. of Jayne Hart, Ex. E.) Four of the Payments were made after the date of this communication, and within 20 days of the Debtors' bankruptcy filing.

USRS argues that the foregoing did not constitute payment pressure but rather were simply "steps to protect its interests without harming" the Debtors. (USRS Reply Br. at 7.) Lack of harm is not the standard for determining applicability of the ordinary course of business exception in § 547(c)(2). It is undisputed that USRS interrupted its efforts and suspended the relocation of the Debtors' employees as a result of the Debtors' failure to make timely payments under the Agreement. The record also indicates that USRS' actions created concern over the implication of nonpayment on the employees' relocation commitment. This concern gives some life to USRS' contemporaneous exchange defense but is inconsistent with the ordinary course of business defense.

The parties focus much attention on whether the Payments were timely made in comparison to their pre-preference course of conduct and the Debtors' pattern of paying two invoices at once in contravention of the Agreement. The Court need not reach this issue. Even if the timing of the Payments was consistent with the Debtors' payment of invoices during the pre-preference period, USRS' pressure tactics detailed above remove the Payments from the scope of the ordinary course of business defense. See *Florida Steel Corp.*, 127 B.R. at 64–65; *Frank v. Volvo Penta of the Americas (In re Thompson Boat Co.)*, 199 B.R. 908 (Bankr. E.D.Mich.1996); *Brown v. Heigel Lumber & Hardware (In re Mid–S. Cabinet & Millwork)*, 125 B.R. 16 (Bankr.E.D.Ark. 1990).

In light of the cases that uniformly hold that an ordinary course of business defense cannot be sustained in the face of a creditor's use of pressure to induce a debtor to pay, USRS' motion for summary

judgment on this issue is wholly without merit. Conversely, there is enough evidence in the record establishing USRS' pressure to grant the Debtors' cross motion for summary judgment striking USRS' defense under § 547(c)(2).

### Conclusion

For the reasons set forth above, USRS' motion for leave to assert a § 547(c)(1) defense is granted; its motion for summary judgment is denied. The Debtors' motion for summary judgment striking USRS' defense under § 547(c)(1) is granted solely with respect to that portion of the Payments that USRS received on account of its charges for fees and interest. The Debtors' motion for summary judgment striking the § 547(c)(2) and the conduit defenses is granted. Further proceedings are required to determine whether USRS' § 547(c)(1) defense is viable as to that portion of the Payments that reimbursed USRS for amounts it had paid to or for the benefit of the Debtors' employees.

In the further proceedings that will be required herein, the parties are also directed to consider the effect, if any, of the refunds that the Debtors were paid postpetition by USRS.

The Debtors are directed to settle an appropriate order on ten days' notice.